FILED
2020 May-06  AM 09:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GEORGETTA BROOKS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-CV-01956-RDP** |
| | } | |
| **PROGRESS RAIL SERVICES** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

### MEMORANDUM OPINION

This matter is before the court on Defendant's Motion for Summary Judgment. (Doc. # 17). Defendant's Motion has been fully briefed (Docs. # 18, 22, 24) and is ripe for review. After careful review, and for the reasons discussed below, Defendant's Motion for Summary Judgment (Doc. # 17) is due to be granted.[1]

## I.    Background

This case involves claims of race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.[2] Plaintiff Georgetta Brooks is an

---

[1] Defendant's Motion to Strike and Supplement Record (Doc. # 25) is also under submission. Defendant's Motion to Supplement the record with Angela Rakestraw's supplemental declaration (Doc. # 25-1) is due to be granted, but its Motion to Strike is due to be denied. (Doc. # 25). The court notes that any potential issues of fact raised in L. William Smith's or Vida Burgess's declarations are either not material to the disposition of Defendant's Motion for Summary Judgment or are otherwise duplicative of other evidence in the Rule 56 record, including but not limited to Plaintiff's deposition testimony.

[2] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

African-American female who worked at Defendant Progress Rail Services Corporation[3] from October 24, 2014 to March 20, 2018. (Docs. # 1 at 2, 4; 19-2 at 50, 57).[4] On July 18, 2014, Plaintiff was hired as a temporary employee at the Little Rock, Arkansas facility. (Docs. # 19-1 at 22-23; 19-2 at 2). Later, on October 24, 2014, Plaintiff was hired as a full-time employee at the Little Rock facility. (Doc. # 19-1 at 37-38). Plaintiff's job was a cone inspector, someone who refurbishes wheel bearings for train wheels. (*Id.* at 29, 130). The responsibilities of a cone inspector include inspecting train wheel parts for defects or damages -- such as a crack in the roller or cage -- and identifying which "cones" are acceptable to proceed to assembly, which cones need repair, or which cones should be discarded or recycled. (*Id.* at 31-32). During her time at the Little Rock facility, Plaintiff never complained of any discrimination or harassment. (*Id.* at 39).

In August 2016, the Little Rock facility shut down, and Plaintiff was transferred to a new facility in Arab, Alabama.[5] (*Id.* at 40). Plaintiff kept her position as a cone operator; however, after the transfer she became the "Team Lead." (*Id.* at 43-44). A "Team Lead" ensured that the hourly workers on the shift were productive and that enough parts were coming down the line. (Doc. # 19-3 at 28). Team Leads were not "supervisors," but rather they served as the point of contact "in lieu of leadership." (Doc. # 19-6 at 48).

During the relevant time period, Plaintiff's direct supervisor was John Fussell, the production manager. (Docs. # 19-3 at 17-26; 19-6 at 14-16). Fussell reported to Daniel Blocker,

---

[3] Progress Rail is a subsidiary of Caterpillar, Inc. (Doc. # 19-3 at 9).

[4] When the court cites to a specific page number, with respect to depositions, the page number corresponds to the deposition page number. With respect to any other document, the court cites to the court-filed page number.

[5] In addition to Plaintiff, Andrew Toliver, Jeremy Watson, and Randy Wiggins moved to the Arab facility. (Doc. # 19-1 at 41-42).

the general manager.[6] (Doc. # 19-6 at 14-16). Angela Rakestraw was the Human Resources Manager for both the Arab and Boaz facilities. (Doc. # 19-7 at 1).

At the Arab facility, there were two shifts: morning shift and night shift. Plaintiff worked the morning shift, which was from 5:30 a.m. to 4:00 p.m. (Doc. # 19-1 at 52). Within this time frame, there were three authorized break times: (1) 8:00 a.m. to 8:15 a.m.; (2) 11:00 a.m. to 11:30 a.m.; and (3) 1:00 p.m. to 1:15 p.m. (*Id.* at 52). Each break was signaled by a buzzer that would sound when the break began and then again when the break ended. (*Id.* at 54). Unauthorized breaks (*i.e.*, breaks taken outside of the regular times) were prohibited. (*Id.* at 55). Plaintiff understood that an employee could only take a break during the scheduled times. (*Id.* at 56-57).

### 1.    Plaintiff's Training on Defendant's Policies

While Plaintiff was at the Little Rock facility, she went through an initial training/orientation, which was conducted by Lawanda Norwood. (Doc. # 19-1 at 35). The orientation covered topics ranging from employee duties, personal protection equipment/safety, and the code of conduct. (*Id.* at 36). To be clear, Plaintiff testified that when she first started work at the Arab facility, she does not recall going through any type of orientation. (*Id.* at 35). Rather, she was required to attend training sessions "month[ly]." (*Id.* at 50). For instance, on July 12, 2017, Plaintiff attended a "refresher" training course on Defendant's harassment policies and the code of conduct. (Doc. # 19-2 at 26). On September 21, 2017, she attended a training session held by Chris Graben regarding cell phone usage and using radios while working. (*Id.* at 58; Doc. # 19-2 at 23). And, on January 4, 2018, she attended a training meeting held by Graben regarding safety policies (including near-miss incidents) and unauthorized breaks. (Docs. # 19-1 at 49, 51, 55-56;

---

[6] Blocker was the interim plant manager at the Arab facility from November or December 2017 to March 2018, when Defendant hired Randy Wiggins. (Doc. # 19-6 at 14-15). Before Blocker became the interim plant manager, Matt Everett was the plant manager. (*Id.* at 14).

19-2 at 18).

      **2.**     **Defendant's Attendance Policy and Guideline System**

Defendant had a "no-fault" attendance policy, which used a points system. (Doc. # 19-4 at 32). Essentially, "if an employee arrive[d] late for a schedule[d] shift, [she would] receive[] ½ point. If the employee[] [was] absent for an entire shift (or more than half a shift), [she would] receive[] 1 point." This system was designed to allow an employee to accumulate up to nine (9) points before Defendant considered the employee's termination. (*Id.* at 32; Doc. # 19-2 at 92). Defendant's policy on "absenteeism and tardiness" provided that if an employee accumulated more than five occurrences within a year, it would be addressed through progressive discipline, which was implemented as follows: a sixth occurrence led to a first written warning; a seventh occurrence led to a second written warning; an eighth occurrence led to a final written warning; and a ninth occurrence led to termination of employment. (Doc. # 23-3 at 3). However, typically an employee would not receive any points for paid or unpaid personal time, vacation time, and "no pay, no penalty" time. (Doc. # 19-3 at 88).

Complementary to its "no-fault" attendance policy, Defendant created a "guideline" for when it noticed an employee exhibiting a negative attendance trend. This "guideline," which was created by Blocker and Rakestraw, provided that if management noticed a "significant downward trend" in an employee's attendance, that employee would be given a "coaching session." (Docs. # 23-3 at 2; 19-4 at 32). A coaching session is not disciplinary in nature, and it does not necessarily go in an employee's personnel file. (Doc. # 19-5 at 23). Rather, its purpose was to note management's "performance concern" related to that employee. (Docs. # 23-3 at 2; 19-4 at 32). For instance, "if an employee ha[d] 3 or more unplanned absences of any kind in a 30-day period, or 5 or more unplanned absences in a 60-day period, or 7 or more unplanned absences in a 90-day

period, the employee [would] receive this additional written coaching." (Doc. # 19-4 at 32). Defendant contends that a coaching session due to a negative attendance trend was separate and apart from its attendance policy. (Docs. # 19-4 at 32; 19-6 at 72). Blocker testified that the negative attendance trend guideline should be viewed as management simply "applying the code of conduct, which is posted and [on which the employees] are trained . . . in [an effort] to curb the unplanned absenteeism." (Doc. # 19-6 at 72). Blocker also testified that this new "guideline" was implemented[7] in January 2018, because "unplanned absenteeism" had created an excessive backlog that negatively impacted the facility's overall operation. (Doc. # 19-6 at 91). However, this "guideline" was not communicated to employees at the Arab facility. (*Id.* at 91-92). Blocker decided not to inform the employees of the guideline because they had already been trained on the attendance policy and code of conduct. (*Id.* at 70-71).

Rakestraw testified that Plaintiff had "shown a long history of abusing the [a]ttendance policy." (Doc. # 19-5 at 34). Indeed, Fussell testified that Plaintiff habitually left her work station without authorization. (Doc. # 19-5 at 45). Plaintiff received numerous coaching sessions and/or Employee Discussion Reports related to attendance issues on the following dates: March 18, 2015 (a first written warning); May 14, 2015 (a second written warning); October 3, 2016 (another first written warning); November 1, 2016 (another second written warning); December 22, 2016 (a final written warning); March 7, 2017 (still another second written warning); January 9, 2018 (a

---

[7] In implementing this new guideline, because there was no "administrative assistant" to assist in the process, Rakestraw would "have to check the employees' records periodically to see when an employee might have more unplanned absences than the limit set by the guidelines." (Doc. # 19-7 at 4, ¶ 5). She testified that she would try to check the records every few weeks, but that "sometimes other work would get in the way to keep [her] from doing a review on a consistent basis." (*Id.*).

coaching session);[8] January 11, 2018 (another final written warning);[9] and February 16, 2018 (another coaching session).[10] (Docs. # 19-2 at 32-35, 40-47; 19-8 at 25). Notwithstanding her habitual attendance issues, in November 2017, Fussell noted in Plaintiff's annual performance review that she "is a really good employee," "really hard working," and an asset to Progress Rail. (Doc. # 19-8 at 22). Fussell testified that it was not until the "last few months" before her termination that she became "unmanageable." (Doc. # 19-5 at 18).

Plaintiff was not the only employee disciplined under the attendance policy or the negative attendance trend guidelines. On January 22, 2018, Bradley Gulledge, a Caucasian male employee, was issued a final written warning (along with Plaintiff) for his unplanned absences. (Doc. # 19-7 at 6-7, ¶ 9). Gulledge was terminated on January 23, 2018 for his negative attendance trend. (*Id.* at 26). On January 6, 2018, Fussell recommended to Rakestraw that Justin Woodruff (a Caucasian male) be issued a coaching session for his failure to follow proper call-in procedures and for having a negative attendance trend. (*Id.* at 4, ¶ 6). On January 25, 2018, Joshua Collum (a Caucasian male) was also issued a coaching session for his continued negative attendance trend with unplanned absences. (*Id.*). On February 9, 2018, Collum was issued a final written warning for his negative attendance trend. (*Id.*). And, on June 8, 2018, Collum was discharged for leaving his work area without authorization after being issued a final written warning. (*Id.*).

---

[8] Fussell issued Plaintiff a coaching session on this date (as opposed to an Employee Discussion Report) for leaving her work station early on four separate occasions within a 30-day period. (Doc. # 19-2 at 47).

[9] By this point, some of Plaintiff's previous occurrences had been removed. The January 11, 2018 Employee Discussion Report was issued due to performance (as opposed to attendance) because, under the negative attendance trend, Plaintiff's numerous absences violated the code of conduct; therefore, it was performance related. (Doc. # 19-2 at 48). Plaintiff refused to sign the January 11, 2018 report. (*Id.*).

[10] Rakestraw also testified that from December 7, 2017 to January 11, 2018, Plaintiff had accumulated six unplanned absences. (Doc. # 19-7 at 6, ¶ 8). Plaintiff disputes this number of unplanned absences, claiming that two absences (on January 10th and 11th) were due to illness. However, Rakestraw testified that Plaintiff failed to present any doctor's note regarding this illness, thus they were counted as unplanned absences. (*Id.*).

### 3.      Defendant's Anti-Discrimination Policy

Defendant maintains a multi-track anti-discrimination and anti-harassment policy. That policy mandates that, should an employee witness or be subjected to any discrimination or harassment, he or she must "immediately report the conduct" to one of the following supervisors: (1) the direct supervisor/manager; (2) the human resources representative; or (3) the facility manager. (Doc. # 19-2 at 12-13, 16-17).

In December 2017, as Plaintiff was getting ready to clock-out, she overheard an employee make a racially-derogatory comment while surrounded by a group of other employees. (Docs. # 19-1 at 85-86; 19-6 at 23, 34). The alleged comment was: "Why are monkeys allowed to play sports? Because they're negros." (Doc. # 19-1 at 85). Plaintiff reported the comment to Blocker, but waited a few days to do so because he was out of the office. (Doc. # 19-1 at 85-86). She preferred not to tell Fussell about the comment because she "felt really comfortable" with Blocker. (*Id.* at 88). After Plaintiff informed Blocker of the comment, he reviewed video footage to identify two individuals who were present in the group when the comment was made—John Smith and Brian Young.[11] (Doc. # 19-6 at 25-26).

Blocker did not inform Rakestraw about the incident. Blocker testified he did not do so because his initial investigation did not uncover enough specific information. (Doc. # 19-6 at 33-34). However, company policy mandates that, upon receiving a complaint of harassment, the supervisor must immediately contact the vice president of human resources at the corporate office to review the matter and start the investigation process. (*Id.* at 37). Blocker did speak with both Smith and Young. (*Id.* at 29). Both denied hearing or making any racial comments. (*Id.* at 30).

---

[11] Plaintiff testified that after she told Blocker about the incident, he allegedly stated that he would "fire everybody that was involved" if he had to. (Doc. # 19-1 at 89-90).

Blocker reported his findings to Plaintiff and asked for more specifics, but she was unable to provide them. (*Id.* at 36).

During this same time period, Smith informed Fussell that he was the individual who made the comment, and Fussell, in turn, told Blocker. (*Id.* at 32-33). Fussell directed Smith to apologize to Plaintiff. (*Id.* at 32). Although Smith received no formal discipline because of the incident, he did apologize to Plaintiff. (Docs. # 19-1 at 82; 19-5 at 12-13).

### 4.    Defendant's Safety Policy

Defendant also maintains a safety policy related to "near-miss" incidents. Employees are required to report to management any and all incidents involving unsafe conditions. (Doc. # 19-4 at 32). If an employee fails to report such an incident, he/she could be subject to disciplinary action, including termination. (*Id.*). Plaintiff received an Employee Discussion Report related to performance and safety on March 15, 2016 (a first written warning) and another one on February 28, 2017 (a second written warning). (Doc. # 19-2 at 36, 46). Therefore, as Rakestraw testified, if there was another safety incident, Plaintiff was in line to receive a final written warning.

On January 15, 2018, Plaintiff was observed pushing cones down the line, causing one to fall on another employee, Viola Smith. (Docs. # 19-1 at 127; 19-5 at 20; 19-7 at 7; Def. Ex. 9 at 0:12-0:14). As a result, Viola threatened to slap Plaintiff in the face. (Doc. #. # 19-1 at 127; 19-7 at 7). Rakestraw verbally counseled Viola to not make any threats to slap anyone, even if she was just "blowing off steam." (Doc. # 19-7 at 8). Before the incident in question, Plaintiff was involved in another incident where she pushed the cones into Viola's hand. (Doc. # 19-5 at 20). Although it is company policy to report near-miss incidents, Plaintiff failed to report this incident to management. (Doc. # 19-1 at 119-20). Plaintiff testified (and the video footage corroborates her assertion) that she did not see the cone fall on Viola at the time it happened. (Doc. # 19-2 at 49;

Def. Ex. 9 at 0:12-0:15). Because she was upset about the incident, Viola informed Fussell of it, and he in turn spoke with Plaintiff. (*Id.* at 20-21). Viola, who resigned shortly after the incident, also complained to Human Resources, and after receiving the complaint Rakestraw undertook an investigation of the incident. (Doc. # 19-5 at 21; Doc. # 19-7 at 7).

On January 23, 2018, Fussell issued Plaintiff a coaching session for the near-miss incident.[12] (Docs. # 19-2 at 49; 19-1 at 49; 19-7 at 8). Rakestraw testified that Plaintiff "had progressed to [f]inal [w]arning at the time of the near miss incident, but [they] chose instead to merely coach her . . . rather than issue formal discipline." (Doc. # 19-7 at 7-8).

### 5.    Events Leading to Plaintiff's Termination

On January 26, 2018, Plaintiff filed her first Charge of Discrimination with the Equal Employment Opportunity Office ("EEOC"). (Doc. # 19-2 at 50). In that Charge, Plaintiff complained about (1) Smith's racial comment, noting that Smith was not disciplined, and (2) receiving the coaching session for failing to report the near-miss incident, which she claimed she did not see. (*Id.*).

On February 16, 2018, Plaintiff received another coaching session after having "been observed on numerous occasions being away from [her] workstation during working hours." (Doc. # 19-2 at 51). At that time, Plaintiff was already on a "final [written] warning." (Doc. # 19-7 at 6, ¶ 8). Plaintiff testified that she was away from her work station on that day because she was ill and had to frequently go to the bathroom. (Doc. # 19-1 at 140-41).

On March 12, 2018, Fussell informed Rakestraw that the cone line day shift was not performing their work as efficiently as they should, and it was causing tension between the shifts. (Doc. # 19-5 at 32). As a result, Fussell suggested that Plaintiff be replaced as Team Lead by

---

[12] Plaintiff refused to sign this coaching session. (Doc. # 19-2 at 49).

Andrew Tolliver, who at the time was a Team Lead in assembly. (*Id.*; Docs. # 19-5 at 49; 19-7 at 10, ¶16).

On March 19, 2018, Plaintiff was "observed [in video footage] leaving [her] work area [without permission] at approximately 10:25 a.m. and going to [her] vehicle . . . ."[13] (Doc. # 19-4 at 62; Def. Ex. 14 at 1:00). Fussell, Blocker, and Rakestraw signed a report stating that "[t]his unauthorized time away from [her] work area [was] unacceptable behavior and ultimately resulted in less production and efficiency for the shop as a whole."[14] (*Id.*). Rakestraw stated in an email that the company had "written other employees up for this very same thing and [they] need to be consistent with [their] disciplinary actions." (*Id.* at 74). On March 20, 2018, due to this incident and Plaintiff's absenteeism and disciplinary history, Blocker terminated her employment.

On July 10, 2018, Plaintiff filed her second Charge of Discrimination with the EEOC. (Doc. # 19-2 at 57). Plaintiff alleged race and gender discrimination, as well as retaliation. (*Id.*). In addition to including her complaints from her first EEOC Charge, Plaintiff referenced the March 19, 2018 incident where she went to her car without authorization. She claimed that Defendant had been trying to "discipline and terminate" her for false reasons, and ultimately terminated her employment on March 20, 2018. (*Id.*). Plaintiff filed this lawsuit on November 28, 2019. (Doc. # 1).

---

[13] Defendant takes the position that Plaintiff was at her vehicle for ten to fifteen minutes. Plaintiff admits going to her car without authorization but argues that she was only away from her work station for about five and a half to six minutes. (Doc. # 19-1 at 157). Video footage corroborates Plaintiff's timeframe. (Def. Ex. 14 at 1:00-6:06). However, the Rule 56 evidence shows that, regardless of the length of time, Plaintiff was still away from her work station in violation of Defendant's policy.

[14] Fussell originally observed Plaintiff leaving her work station. (Doc. # 19-5 at 35). Fussell was looking for another employee (Chris Selby), who had caused numerous problems by leaving his work station. (Doc. # 19-5 at 36-37). While Fussell was looking for Selby, he noticed Plaintiff. (*Id.*). Rakestraw stated in an email that Selby needed to be issued an Employee Discussion Report as well (Doc. # 19-4 at 74, 78), and a report was issued to him on March 20, 2018. (Doc. # 19-7 at 29-30).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party

bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

Plaintiff's Complaint asserts three claims: (1) race discrimination (Count One), (2) gender discrimination (Count Two), and (3) retaliation (Count Three).[15] After careful review, the court

---

[15] Title VII and § 1981 claims are evaluated using the same analytical framework. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof

concludes that Defendant's Motion for Summary Judgment (Doc. # 17) is due to be granted.

### A.        Plaintiff's Discrimination Claims

Plaintiff claims that Defendant discriminated against her because of her race and gender by unfairly disciplining her pursuant to its "negative attendance trend" guideline and by terminating her employment. The court first reviews the relevant legal test, and then applies it to each claim.

### 1.        The *Prima Facie* Case Requirements and the Court's Analysis

Absent direct evidence of discrimination (and, to be clear, there is none here) employment discrimination claims have historically been evaluated under the burden-shifting framework developed by the Supreme Court in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, a plaintiff may satisfy her initial burden of establishing a *prima facie* case by presenting evidence that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside [her] protected class or was treated less favorably than a similarly-situated individual outside [her] protected class." *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). If the plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). If the employer satisfies that "exceedingly light" burden, the burden again shifts to the plaintiff to offer evidence from which a reasonable jury could find that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994); *Perryman v. Johnson Prod.*

---

and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.").

*Co.*, 698 F.2d 1138, 1141-42 (11th Cir. 1983). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it "head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

Here, Defendant argues that, with respect to some or all of her claims, Plaintiff cannot establish the third and fourth elements of her *prima facie* case.

### a.      Plaintiff's Termination Was an Adverse Employment Action

"Under the third element of the *prima facie* case, for conduct to qualify as an adverse employment action, the conduct must, in some substantial way, alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive . . . her of employment opportunities, or adversely affect [ ] . . . her status as an employee." *Powell v. Nat'l Labor Relations Bd.*, 2019 WL 4572915, at *4 (N.D. Ala. Sept. 20, 2019) (quoting *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008)) (internal quotation marks omitted). "To determine whether an employment action is 'adverse,' courts use an objective test: whether a reasonable person in the plaintiff's position would consider the employment action materially adverse." *James v. City of Montgomery*, 2019 WL 3346530, at *7 (M.D. Ala. July 25, 2019); *see Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000), *overruled on other grounds by Cheatham v. Dekalb Cty., Ga.*, 682 F. App'x 881 (11th Cir. 2017) ("Whether an action is sufficient to constitute an adverse employment action . . . must be determined on a case-by-case basis.").

Here, for obvious reasons, Plaintiff's termination qualifies as an adverse employment action. Discharging an employee is the quintessential adverse employment action.

### b.      On This Record, Employee Discussion Reports and Coaching Sessions Are Not Themselves Adverse Employment Actions

Although Defendant acknowledges that Plaintiff's termination is an adverse employment action, it asserts that Plaintiff cannot show that the Employee Discussion Reports or coaching

sessions (which were issued to her as a result of the company's negative attendance trend guideline, near-miss incident, and unauthorized absenteeism) rise to that level. The court agrees.

First, with respect to the Employee Discussion Reports, there is no Rule 56 evidence suggesting that these Reports "materially" altered or changed Plaintiff's employment. Nothing about the terms and conditions of her position as a cone inspector changed after she was issued these Reports. And, her compensation remained the same.

Second, coaching sessions are not "disciplinary" in nature (*see* Doc. # 19-5 at 23), do not generally go into an employee's personnel file, and there is no Rule 56 evidence indicating that they "serious[ly] or material[ly] change[d] [] the terms, conditions, or privileges of [Plaintiff's] employment." *Dixon v. Palm Beach Cty. Parks and Recreation Dep't*, 343 F. App'x 500, 502 (11th Cir. 2009) (quotation omitted). Indeed, written or verbal criticisms of an employee's job performance that do not lead to *tangible* job consequences are insufficient to constitute an actionable adverse employment action. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1241 (11th Cir. 2001), *overruled on other grounds by Minnifield v. City of Birmingham Dep't of Police*, 791 F. App'x 86 (11th Cir. 2019) (emphasis added).

Although Plaintiff argues that, aggregated together, these "disciplinary" actions led to her termination, even viewed cumulatively, the Rule 56 evidence does not support an argument that they materially altered or affected her employment. Defendant had a system that allowed Employee Discussion Reports to be removed from an employee's personnel file after a certain time period if the employee's conduct improved. (Doc. # 19-3 at 116). Therefore, Plaintiff had the opportunity to have these Reports removed from her record, yet she did not avail herself of that opportunity. *See Davis*, 245 F.3d at 1239 ("[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially

adverse as viewed by a reasonable person in the circumstances.").

Thus, the Employee Discussion Reports and coaching sessions do not independently qualify as adverse employment actions. However, as noted above, Plaintiff was terminated on March 20, 2018—and discharge is clearly an adverse employment action. Therefore, Plaintiff has established that she suffered an adverse employment action with respect to her termination. To be clear, the reports and sessions at issue may serve as background evidence that informs (and supports) her termination claim. But, the reports themselves are not independently actionable.

### c. Plaintiff Cannot Point to Any Comparator Evidence to Support Her Termination Claim

In order to establish a *prima facie* case with respect to her termination, Plaintiff must show that a similarly-situated employee outside of her protected class (*i.e.*, race and gender) was treated more favorably than her—that is, that a Caucasian male engaged in similar conduct (*i.e.*, unplanned absences and unauthorized breaks) but was not terminated. With respect to both her race and gender, she has failed to do so.[16]

Under *McDonnell Douglas*, an employee identified as a comparator by a Title VII plaintiff must be "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1226 (11th Cir. 2019). The Eleventh Circuit has explained that this comparator analysis is properly assessed as part of the *prima facie* case analysis. *See id.* at 1218. And, our Circuit has also clarified how a Title VII plaintiff can meet this standard: she must establish that the comparator (1) "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) "will have been subject to the same employment policy, guidelines, or rule as the plaintiff;" (3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor

---

[16] To be clear, Plaintiff has not attempted to establish the race or gender of her replacement, and thus cannot establish a *prima facie* case using that variation of the analysis.

as the plaintiff;" and (4) "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28. "A valid comparison will turn not on formal labels, but rather on substantive likenesses. . . . [A] plaintiff and [his] comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Service, Inc.*, 135 S. Ct. 1338, 1355 (2015)). Under this standard, "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.*

Plaintiff has failed to proffer evidence regarding an appropriate comparator. First, Plaintiff claims Chris Selby (a Caucasian male) is a proper comparator, as he engaged in the same misconduct as her on March 19, 2018, but he was not terminated. However, after careful review, the court concludes Selby is not an appropriate comparator under *Lewis*.

Plaintiff notes that Selby was "notorious" for leaving his work station without permission. (Doc. # 19-5 at 35-36). And, on March 19, 2018, Selby engaged in the same misconduct as Plaintiff—he left his work station without authorization. He was also subject to the same negative attendance trend guideline. But, the similarities between the two end there.

Selby was a relatively new employee, he was not a cone inspector, and he was not a Team Lead.[17] At the time of this incident (on March 19, 2018), Selby had only received a first written warning. (Doc. # 19-7 at 12, ¶ 19). As a result of the incident on March 19, 2018, he received a second written warning. (*Id.*). In contrast, Plaintiff was on her final written warning when she left her work station without permission. Termination was the next disciplinary measure she faced

---

[17] It is unclear from the Rule 56 record whether Plaintiff and Selby were under the same supervision. (Doc. # 19-5 at 37).

under Defendant's progressive disciplinary policy. Because Selby was not on a final written warning when he was found to have left his work station without permission, he did not share Plaintiff's employment history or her disciplinary history. So, Selby was in a different position, was new, and was not at the same disciplinary level. These are material differences. Therefore, he is not an appropriate comparator.[18]

Plaintiff makes another unavailing effort to identify a comparator. She asserts that Andrew Tolliver (an African-American male) and Nathaniel Glass (a Caucasian male), both Team Leads, are appropriate comparators. Plaintiff contends that Tolliver and Glass both had negative attendance trends, but were not disciplined or terminated for such conduct. However, Plaintiff's assertions miss the mark for multiple reasons.

First, Plaintiff complains that on two separate Saturday shifts -- January 6, 2018 and January 13, 2018 -- Tolliver and Glass (as well as other employees) were not disciplined for their "unplanned absences" when they left work early. However, Rakestraw testified that Saturday shifts are not structured by specific time frames, but rather by the amount of work to be completed. (Doc. # 25-1 at 3, ¶ 4). Rakestraw testified that Tolliver and Glass were not disciplined for leaving early because they had completed the required number of pallets/bearings on those two Saturdays and thus they were actually authorized to leave early. (*Id.*). Plaintiff, on the other hand, left at 9:50 a.m. on January 6, 2018, without permission. (*Id.* ¶ 6).

Second, neither Tolliver nor Glass accumulated enough unplanned absences to run afoul of the negative attendance trend. (Doc. # 25-1 at 4, ¶¶ 6-8).

Third, Plaintiff mixes apples and oranges (which *Lewis* explicitly advises against). For

---

[18] After the March 19th incident, on March 27, 2018, Selby was issued a final written warning for "his negative attendance trend with unplanned absences." (*See id.*). Thereafter, he was terminated on July 13, 2018 for using his cell phone. (*Id.*). So, in actuality, Selby was, like Plaintiff, terminated for committing an infraction when he was on a final written warning.

instance, Plaintiff claims Tolliver was on his second written warning going into February 2018, and therefore should have received a final written warning for having a negative attendance trend in February 2018. However, Plaintiff fails to specify what infractions Tolliver committed in February 2018 to warrant further discipline under the negative attendance trend. She also complains that on June 5, 2018, Tolliver was not terminated after committing the same infraction—leaving his work station without permission. And, while the undisputed Rule 56 evidence shows that on June 5, 2018, Tolliver received a final written warning for being away from his work station (*Id.* ¶ 7), there is no evidence that Tolliver had *previously* received a final written warning. (*Id.*). Further, Rakestraw testified that all of Glass's absences were planned and approved. (*Id.* ¶ 8). There is no Rule 56 evidence contradicting that testimony.

Plaintiff also asserts that Jonathan Smith, Jagger Edmondson, and Randy Murphree are appropriate comparators who were not disciplined under the negative attendance trend. The Rule 56 evidence does not support that argument, either. Rakestraw testified that Smith, Edmondson,[19] and Murphree had not had three or more unplanned absences in a 30-day period; therefore, their conduct did not violate the code of conduct. Notably, regarding one of the alleged unplanned absences (January 16, 2018), all three left early -- with approval -- due to inclement weather. (*Id.* ¶ 9-11).

Simply put, the Rule 56 record is devoid of any evidence that a Caucasian and/or male employee, who was on a final written warning, committed a subsequent attendance infraction of

---

[19] Rakestraw admits that, with respect to Edmondson, she may have "erred and not caught [Edmondson's] violation of the guidelines." (Doc. # 25-1 at 5, ¶ 10). But, as she had previously testified, this was a new system and there were still kinks to be worked out. (Doc. # 25-1 at 5, ¶ 10). This single "mistake" with respect to Edmondson, however, is insufficient to warrant a finding by a jury that Defendant discriminated against Plaintiff because of her race and/or gender. From January 2, 2018 to March 22, 2018, Edmondson received a total of two points (totaling three "occurrences"). (Doc. # 25-1 at 14-15). However, it is unclear how many occurrences or points Edmondson had before January 2, 2018 and where these three "occurrences" placed him with respect to the number of "occurrences" he had. In any event, there is nothing in the record suggesting that Edmondson was a habitual offender in his absences or had the same disciplinary history as Plaintiff.

leaving one's work station without authorization but was not terminated. Therefore, Plaintiff has failed to establish the fourth element of her *prima facie* case of race or gender discrimination.

### d. Defendant Has Articulated Legitimate, Non-discriminatory Reasons for Plaintiff's Termination

Even if Plaintiff had established a *prima facie* case of race and gender discrimination (and, to be clear, she has not), Defendant has offered legitimate, non-discriminatory reasons for its decision to terminate Plaintiff. Defendant terminated Plaintiff under its progressive discipline policy for (1) violating the attendance policy on numerous occasions, (2) having a negative attendance trend with respect to her unplanned absences, and (3) taking an unauthorized break after a final written warning. Defendant has articulated non-discriminatory reasons for Plaintiff's termination. "Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges. [The court is] not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" *Flowers v. Troup Cty, Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)). Because Defendant articulated legitimate, non-discriminatory reasons for Plaintiff's termination, even if she had established a *prima facie* case, the burden would still shift back to her to show that Defendant's proffered reasons are a pretext for unlawful discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). The court undertakes this analysis for completeness, even though Plaintiff has not established a *prima facie* case.

### e. Plaintiff Has Failed to Establish that Defendant's Articulated Reasons are Pretext for Race or Gender Discrimination

"A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Husk v. City of Talladega, Ala.*, 2019 WL

2578075, at *4 (N.D. Ala. June 24, 2019) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993)). Here, Plaintiff has failed to show that Defendant's reasons for terminating her are false and that its true intent was to discriminate against her. She has failed to point out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' proffered reasons that would allow a reasonable factfinder to deduce that those reasons are unworthy of credence. *Paschal v. United Parcel Serv.*, 573 F. App'x 823, 825 (11th Cir. 2014) (quotation omitted).

Plaintiff was not the only employee disciplined under the attendance policy or the negative attendance trend guidelines. On January 22, 2018, Bradley Gulledge, a male employee, was issued a final written warning (along with Plaintiff) for his unplanned absences. (Doc. # 19-7 at 6-7, ¶ 9). Gulledge was terminated on January 23, 2018 for his negative attendance trend. (*Id.* at 26). On January 6, 2018, Fussell recommended to Rakestraw that Justin Woodruff (a Caucasian male) be issued a coaching session for his failure to follow proper call-in procedures and for having a negative attendance trend. (*Id.* at 4, ¶ 6). On January 25, 2018, Joshua Collum (a Caucasian male) was also issued a coaching session for his continued negative attendance trend with unplanned absences. (*Id.*). On February 9, 2018, Collum was also issued a final written warning for his negative attendance trend. (*Id.*). On June 8, 2018, Collum was discharged for leaving his work area without authorization after being issued a final written warning. (*Id.*).

Rakestraw testified that between January and March 2018, Defendant "issued sixteen other employee [c]oaching [s]essions . . . and issued discipline to nine other employees for similar problems with downward attendance trends and unplanned absences" to employees at its Arab facility. (*Id.* ¶ 10). The records show that a majority of employees who received coaching sessions and Employee Discussion Reports for code of conduct violations and for not remaining at their

work stations were Caucasian males. (Doc. # 19-7 at 29). And, Collum, a Caucasian male, was discharged for the same reason as Plaintiff.

Thus, putting aside Plaintiff's subjective belief that she was unfairly treated, there is no evidence in the Rule 56 record indicating either that Defendant's articulated reasons for Plaintiff's termination were false, or that the true reason for her termination was due to racial and/or gender animosity.

> ### 2.  Plaintiff Has Failed to Present Other Circumstantial Evidence of Race and/or Gender Discrimination

Although it is often useful, the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005). A plaintiff's claim will also survive summary judgment if she otherwise presents "enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). This alternative has been referred to as the "mosaic theory." *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Viewing all the Rule 56 evidence in the light most favorable to Plaintiff, and for the reasons indicated above, the court concludes that there is not enough other circumstantial evidence from which a reasonable jury could conclude that Defendant discriminated against Plaintiff because of her race and/or gender. Plaintiff notes that Defendant did not publicize the negative attendance trend guidelines, which she claims raises questions about its fairness. (Doc. # 19-6 at 91). Blocker testified he made that decision because many employees had figured out how to manage their attendance "to remain at a certain level of points." (Doc. # 19-6 at 92). Considering that there is no evidence in the Rule 56 record indicating that this guideline was applied in an uneven or discriminatory manner, the fact that employees were managing their attendance points is a "reason

. . . that might motivate a reasonable employer" to keep the guideline under wraps. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).

Courts are prohibited from second-guessing a defendant's business judgment where there is no indication of a discriminatory motivation. *See Pennington*, 261 F.3d at 1267 *(*"[F]ederal courts do not sit to second-guess the business judgment of employers.") (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)). That is the case here. Unfairness is not a Title VII violation. All employees, regardless of race or gender, were in the same position as Plaintiff—none of them were told about the guidelines. Therefore, Plaintiff has not presented sufficient other circumstantial evidence to put her discrimination claims before a jury.

### 3.   Plaintiff Has Failed to Establish a Race and/or Gender Discrimination Claim Under the Mixed-Motive Framework

Finally, in some cases, a plaintiff can survive a motion for summary judgment under a mixed-motive framework, wherein "the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision.'" *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)). This framework does "not call for the unnecessary burden-shifting required by *McDonnell Douglas,* nor does it suffer from *McDonnell Douglas*'s pitfall of demanding that employees prove pretext." *Quigg*, 814 F.3d at 1240. The court, however, concludes that Plaintiff's claims do not fit this mold.

It is readily apparent from the undisputed Rule 56 evidence that Defendant disciplined and terminated employees under the negative attendance trend guideline regardless of race or gender. For example, both men and women were "coached" under this guideline. (Doc. # 19-8 at 3 (coaching session issued to Bradley Gulledge for leaving his work station unauthorized); Doc. #

23

19-8 at 4 (coaching session issued to Mary Pearce for her absenteeism)). Additionally, male employees and both Caucasian and African-American employees were disciplined under this guideline. (Doc. 19-8 at 2 (coaching session issued to Justin Woodruff -- a Caucasian male -- for leaving work early); Doc. # 25-1 at 9 (Employee Discussion Report issued to Andrew Tolliver -- an African-American male -- for being away from his work station unauthorized)).

Consequently, even viewing the facts in the light most favorable to Plaintiff, there is insufficient circumstantial evidence from which a reasonable juror could conclude that Plaintiff's race and/or gender was a motivating factor in Defendant's decision to terminate her. Therefore, the burden never shifts to Defendant to make its required showing—that it would have made the same decision in the absence of an improper motive. Defendant's Motion for Summary Judgment (Doc. # 17) is due to be granted as to Plaintiff's claims of race (Count One) and gender (Count Two) discrimination.

### B.    Plaintiff's Retaliation Claims

Plaintiff also contends that Defendant retaliated against her when it (1) issued her coaching sessions under the negative attendance trend guideline, and (2) terminated her employment.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding . . . ." 42 U.S.C. § 2000e–3(a). Claims of retaliation, under both Section 1981 and Title VII, follow the *McDonnell Douglas* burden-shifting framework. *Jackson v. Geo Group, Inc.*, 312 F. App'x 229, 233 (11th Cir.2009); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). Therefore, the court analyzes Plaintiff's Section 1981 and Title VII retaliation claims together.

To establish a *prima facie* case of retaliation under Title VII and Section 1981, the plaintiff must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action by the employer simultaneously with or subsequent to such opposition or participation; and (3) a causal connection exists between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008); *see also Edmond v. Univ. of Miami*, 441 F. App'x 721, 724 (11th Cir. 2011) (applying same *prima facie* case in Section 1981 cases). "If a plaintiff establishes a *prima facie* case of retaliation and the employer proffers a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must then demonstrate that the employer's proffered explanation is a pretext for retaliation." *Watson v. Kelley Fleet Servs., LLC*, 430 F. App'x 790, 791 (11th Cir. 2011) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997)).

Plaintiff has pointed to two acts that she claims led to Defendant's retaliatory actions (*i.e.*, the coaching sessions and her termination): (1) her December 2017 report to Blocker about the racial comment; and (2) her January 2018 EEOC Charge. These activities sound in Title VII's opposition clause and its participation clause, respectively. The court addresses both types of activities separately and concludes that Plaintiff has failed to establish a *prima facie* case of retaliation with respect to both claims.

### 1.    Plaintiff's Opposition Clause Claim

### a.    Plaintiff's Protected Conduct

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e–3(a). This phrase has been referred to as Title VII's opposition clause. Section 1981 has been interpreted to prohibit race-based retaliation as well, and that includes an employee's opposition

to race discrimination. An employee who opposes discrimination is shielded from retaliation, so long as that opposition is based on both a subjective (good faith) belief and an objective (reasonable) belief that the employment practice violated Title VII (and, again, in the case of race-based employment practices, Section 1981). *Bryant v. United States Steel Corp*., 428 F. App'x 895, 897-98 (11th Cir. 2011); *Anduze*, 151 F. App'x at 878; *Little v. United Techs*., 103 F.3d 956, 960 (11th Cir.1997).

In December 2017, Plaintiff overheard a racial comment made by another employee. She complained to Blocker about the comment a few days later. (Doc. # 19-1 at 85-86). Plaintiff asserts that this report constitutes protected opposition.

There are two components to the good faith belief required for opposition to be protected: "A plaintiff must not only show that [s]he *subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was *objectively* reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960 (emphasis in original). Here, Plaintiff has failed to show that she had a good faith, reasonable belief that Defendant was engaged in an unlawful employment practice.

This was a single, isolated comment made by a non-supervisor. Plaintiff did not assert that the comment was heard by a supervisor who failed to act. Nor has Plaintiff pointed to any "practice" that Defendant was engaged in that she had a reasonable belief was unlawful. An unlawfully hostile environment is one where the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [one's] employment and create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299 (11th Cir. 2012) (quotation omitted). Plaintiff has not alleged that there was a pattern of racial comments of which Defendant was aware and failed to take action. Indeed, she

has only identified this one stray comment by a co-worker, which was not directed at her personally.

Moreover, as soon as Plaintiff complained to Blocker about the comment, he investigated it, identified and spoke with the individuals involved, and the person who made the comment ultimately apologized to Plaintiff. (Doc. # 19-5 at 12-13). Even if Plaintiff subjectively believed that this one, isolated comment was an unlawful employment practice, that belief would not be objectively reasonable. *Butler v. Alabama Dep't of Trans.*, 536 F.3d 1209, 1214 (11th Cir. 2008) ("[A] racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under the opposition clause of Title VII, and opposition to such a remark, consequently, is not statutorily protected conduct.") (quoting *Little*, 103 F.3d at 961); *Little*, 103 F.3d at 961 ("[N]o rational jury could find [Plaintiff's] belief that [her] opposition to [Smith's] racist remark constituted opposition to an unlawful employment practice to be objectively reasonable.").

To be clear, the court has heeded the Eleventh Circuit's teaching that "a plaintiff can prevail on a retaliation claim based on opposition to an employment practice that is not actually unlawful." *Butler*, 536 F.3d at 1214 (citation omitted). But, the court must consider "the controlling substantive law in this circuit when [assessing] whether a plaintiff's mistaken belief is objectively reasonable." *Id.* As is the case here, "[w]here binding precedent squarely holds that particular conduct is not an unlawful employment practice by the employer, and no decision of [the Eleventh Circuit] or of the Supreme Court has called that precedent into question or undermined its reasoning, an employee's contrary belief that the practice is unlawful is unreasonable." *Id.*

For these reasons, Plaintiff's complaint to Blocker does not qualify as protected opposition. Therefore, it cannot serve as a basis for a retaliation claim.

### b.       Alleged Adverse Employment Action

Even if Plaintiff had presented evidence that she engaged in protected opposition conduct (and, to be clear, she has not), she would be required to show she suffered an adverse employment action. The standard for what constitutes an adverse employment action in the retaliation context differs from the standard applied in the discrimination context. *See Mills v. Cellco P'ship*, 376 F. Supp. 3d 1228, 1244 (N.D. Ala. 2019) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "In order to constitute an adverse employment action for purposes of establishing a *prima facie* case [of retaliation], the action must be materially adverse from the standpoint of a reasonable employee, such that it would dissuade a reasonable employee from making a discrimination charge." *Williams v. Apalachee Ctr., Inc.*, 315 F. App'x 798, 799 (11th Cir. 2009) (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57, 68). "Such a determination is inherently fact-specific and "depend[s] upon the particular circumstances" of the case." *Allen*, 963 F. Supp. 2d at 1251 (citations omitted).

Clearly, the termination of Plaintiff's employment qualifies as an actionable adverse employment action in the retaliation context. Whether the coaching sessions under the negative employment trend are actionable is a closer question.

Again, Title VII's retaliation provision (and the case law interpreting it) takes a different approach to the adverse employment action inquiry. *Perkins v. Kushla Water Dist.*, 21 F. Supp. 3d 1250, 1266 (S.D. Ala. 2014) ("An adverse employment action in the retaliation context is an act that would 'dissuade a reasonable worker from making or supporting a charge of discrimination.' Thus, it is not limited to retaliatory actions that affect the terms and conditions of employment.") (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 64 (2006)). So, the court's conclusion that a coaching session is not an adverse employment action in the context of Plaintiff's

discrimination claim does not control the inquiry here. That is, while on this record coaching sessions did not materially alter Plaintiff's terms and conditions of employment, the Rule 56 evidence nevertheless supports the inference that an accumulation of these coaching sessions could be used as the basis for actual disciplinary actions. Therefore, they could dissuade a reasonable worker, such as Plaintiff, from making a complaint of discrimination. As a result, the court concludes that the coaching sessions Plaintiff received under the negative employment trend qualify as adverse employment actions for purposes of her retaliation claim.

### c.   There is No Causal Connection Between Plaintiff's December 2017 Report to Blocker Regarding the Racial Comment and Her Coaching Sessions or Her Termination

Again, had Plaintiff established she engaged in protected conduct, she would be required to show that the challenged employment actions (*i.e.*, her coaching sessions under the negative attendance trend guideline and her termination) were causally related to the protected conduct (her December 2017 report to Blocker regarding the racial comment). "A plaintiff may show a causal link with proof that "the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999). But, "mere temporal proximity, without more, must be 'very close.'" *Gray v. City of Montgomery*, 756 F. Supp. 2d 1339, 1350 (M.D. Ala. 2010). And, a plaintiff "must establish that [] her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). And,

With respect to Plaintiff's coaching sessions under Defendant's negative attendance trend guideline, Defendant implemented this guideline in January 2018 and started coaching employees, including Plaintiff, immediately thereafter. For instance, Plaintiff received her first coaching

session under this guideline on January 9, 2018. (Doc. # 19-2 at 47). Because Plaintiff reported the racial comment to Blocker in December 2017, there appears to be a close temporal connection between the two—approximately one month. *See Summers v. City of Dothan*, 444 F. App'x 346, 351 (11th Cir. 2011) ("Showing that an adverse employment action happens within one month of the protected activity satisfies the causation requirement for summary judgment purposes.") (citation omitted). However, this timing alone is insufficient to show that Plaintiff's January 9, 2018 coaching session was a but-for cause of her report to Blocker. This is so because even a close temporal connection may be severed when there is an intervening act of misconduct that breaks the causal link between the protected activity and the adverse employment action. *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011). Indeed, courts have found that even cases with "very close" temporal connections of one month or even three days will not satisfy the required but-for causation requirement when there is evidence of an intervening act of misconduct. *See Diaz v. Florida*, 219 F. Supp. 3d 1207, 1220 (S.D. Fla. 2016) (granting summary judgment for employer when it was undisputed that, between the time of the alleged protected activity and the time of the termination, "[the plaintiff] was suspected of attempted theft of state property, which was an intervening act of misconduct"); *see also Fleming v. Boeing*, 120 F.3d 242, 248 (11th Cir. 1997) (intervening act breaks causal connection between a protected act and an adverse action).

Here, there were intervening acts of misconduct between Plaintiff's report to Blocker and her first coaching session (on January 9th). Plaintiff left her work station early on four separate occasions within a 30-day period—on December 7, 2017, December 19, 2017, January 3, 2018, and January 6, 2018. (Doc. # 19-2 at 47). Thus, any causal connection was severed.[20]

---

[20] There is nothing in the Rule 56 record indicating that Defendant implemented the guideline as a response to Plaintiff's December 2017 report to Blocker. Indeed, just the opposite is the case, based on the summary judgment evidence. The Guideline was applied to other employees who were gaming the system during the same time period.

The court also concludes that Plaintiff has not sufficiently shown a causal connection with respect to her termination. Plaintiff reported the comment to Blocker in December 2017, but she was not terminated until March 20, 2018. So, unlike the initial coaching session, the time period between her opposition and her termination is simply too tenuous. *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229-30 (11th Cir. Jan. 25, 2011) (holding that a two-month gap between two events is enough of a delay to preclude an inference of causation); *see Gray*, 756 F. Supp. 2d at 1350 (concluding that a three-to-four-month gap between the time the plaintiff filed her charge of discrimination and any later disciplinary action was insufficient to support the finding of a causal connection). Thus, because there is no temporal proximity (nor any other evidence of a causal connection, for that matter), Plaintiff has failed to put forth substantial evidence that her comment to Blocker was a but-for cause of her termination. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1362, 1364 (11th Cir. 2007) (holding that the plaintiff did not establish a causal connection between a complaint of sexual harassment and a termination of employment three months later where she did not present other evidence).

For all these reasons, Plaintiff has failed to establish a *prima facie* case of retaliation under the opposition clause.

### 2.      Plaintiff's Participation Clause Claim

#### a.      Plaintiff's Protected Conduct and Adverse Employment Actions

In addition to the opposition clause, Title VII makes it unlawful for an employer to discriminate against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). "Statutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based

lawsuits." *Gray*, 756 F. Supp. 2d at 1349 (quoting *Gerard v. Board of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009)). It is undisputed that, in filing her EEOC Charge in January 2018, Plaintiff engaged in protected activity under the participation clause. *See Gray*, 756 F. Supp. 2d at 1349.

Consistent with the court's conclusions above, both Plaintiff's coaching sessions and her termination qualify as actionable adverse employment actions under Title VII and Section 1981's retaliation provisions. So, because Plaintiff has shown she filed a charge and then suffered adverse employment actions, her retaliation claim hinges on whether she can establish a causal connection between her January 2018 EEOC Charge and her subsequent coaching sessions and/or her termination.

> **b.     There is No Causal Connection Between Plaintiff's January 2018 EEOC Charge and Her February 2018 Coaching Session Under the Negative Attendance Trend Guideline**

After careful review, the court concludes that Plaintiff has failed to point to any Rule 56 evidence indicating that there is a causal connection between her Title VII participation and an adverse employment action. First, Plaintiff has failed to show that any coaching session before the one on February 16, 2018 is causally related to her January 2018 EEOC Charge. Defendant implemented this guideline in January 2018 and started coaching employees, including Plaintiff, under that guideline before she ever filed her first EEOC charge. (Doc. # 19-6 at 91). Plaintiff received her first coaching sessions under this guideline on January 9, 2018. (Doc. # 19-2 at 47). She received another coaching session on January 11, 2018. (*Id.* at 48). On January 26, 2018, Plaintiff filed her first EEOC charge. The charge was sent to Defendant on February 9, 2018. (Doc. # 1 at ¶ 19). On February 16, 2018, Plaintiff received another coaching session. (*Id.* at 51).

Here, admittedly there was only a short period between Plaintiff's January 2018 EEOC Charge and her February 16, 2018 coaching session. However, under these circumstances, the court cannot find that close timing alone is sufficient to establish a causal link. Plaintiff had already been coached for attendance issues before she filed her EEOC Charge. The pattern of Plaintiff's attendance issues, and her receipt of employment coaching sessions, merely continued after she filed the charge.[21] Under these circumstances, the close temporal proximity between these two events by itself is insufficient to satisfy the causation element of Plaintiff's *prima facie* case. *See Thomas*, 506 F.3d at 1364. Thus, Plaintiff has not established that her EEOC charge was the "but-for" cause of her February 16th coaching session.

Additionally, Plaintiff has failed to show that her January 2018 charge is causally related to her termination. Where temporal proximity is the *only* evidence of causation, that proximity must be "very close." *Thomas,* 506 F.3d at 1364 (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)). Here, Plaintiff's EEOC Charge and her termination are simply not sufficiently close.

The time period between Plaintiff's EEOC charge and her termination is approximately two months. The cases cited above stand for the proposition that this two-month temporal gap between Plaintiff's protected conduct and her termination does not *alone* establish causation. *See e.g.*, *Williams*, 411 F. App'x at 229-30 (holding that although a two-month gap is close in time, it is not "very close" so as to establish a *prima facie* case of retaliation); *Gray*, 756 F. Supp. 2d at 1350 (concluding that a three-to-four-month gap between the time the plaintiff filed her charge of

---

[21] Plaintiff's numerous and continual violations and consequent coaching sessions create somewhat of an irony here. On the one hand, her pattern of attendance issues both preceded and succeeded the filing of her charge. In other words, the pattern of attendance issues, which led to her coaching sessions, merely continued after she filed her charge. On the other hand, her subsequent attendance-related violations committed after she filed her charge amounted to a break in any causal connection between her charge and termination.

discrimination and any later disciplinary action was insufficient to support the finding of a causal connection). And, as stated above, even a close temporal connection may become severed when there is an intervening act of misconduct that breaks the causal link between the protected activity and the adverse employment action. *Henderson*, 442 F. App'x at 506.

Here, Plaintiff received her first final written warning in 2016. She was given another final written warning on January 11, 2018. (Doc. # 19-2 at 48). Despite having received a final written warning in January, Plaintiff only received a coaching session on February 16, 2018. (Doc. # 19-7 at ¶8). Thereafter, on March 19, 2018, Plaintiff was discovered to have gone to her car without authorization (and not during an approved break time). Plaintiff has admitted that she went to her car without authorization (although she disputes the length of time she was AWOL). Therefore, she has admitted the conduct for which Defendant terminated her employment. Under these facts, any causal link that might have arisen based on timing was broken by Plaintiff's admitted, intervening misconduct. Therefore, Plaintiff has failed to establish a *prima facie* case of retaliation.

Even if Plaintiff had established a *prima facie* case of retaliation (and to be clear, she has not), for the reasons discussed above regarding Plaintiff's discrimination claims, Defendant has articulated legitimate, non-retaliatory reasons for Plaintiff's termination, and Plaintiff has not shown, in any manner, that those reasons are pretextual. Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## IV.    Conclusion

For all the reasons stated above, Defendant's Motion for Summary Judgment (Doc. # 17) is due to be granted. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this May 6, 2020.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE